[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 22-10514

_____

NORTH SHORE MEDICAL CENTER, INC.,
LIFEMARK HOSPITALS OF FLORIDA, INC.,
d.b.a. Palmetto General Hospital,
DELRAY MEDICAL CENTER, INC.,
GOOD SAMARITAN MEDICAL CENTER, INC.,
PALM BEACH GARDENS COMMUNITY HOSPITAL, INC.,
d.b.a. Palm Beach Gardens Medical Center,
ST. MARY'S MEDICAL CENTER, INC.,
WEST BOCA MEDICAL CENTER, INC.,

                      Plaintiffs-Appellants,

CGH HOSPITAL, Ltd.,
d.b.a. Coral Gables Hospital,

                      Interested Party-Appellant,

*versus*

CIGNA HEALTH AND LIFE INSURANCE COMPANY,

                                        Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-24914-KMM

————————————

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

NEWSOM, Circuit Judge:

Florida law requires hospitals to provide emergency care to all comers—even those who are, in insurance lingo, "out of network." Because emergency treatment costs money, and because hospitals can't give it away for free, Florida law also requires insurers to reimburse hospitals for some portion of their ER costs. Fla. Stat. § 627.64194(4). As relevant here, the measure of what the insurer owes is the fair market value "in the community where the services were provided." *Id.* § 641.513(5)(b).

The dispute underlying this appeal began when eight South Florida hospitals dutifully provided out-of-network emergency treatment to numerous Cigna customers. When Cigna reimbursed the hospitals just 15% of what they had charged, the hospitals sued, accusing Cigna of paying less than the "community" rate.

As proof, the hospitals showed that they normally receive five times as much for the care they provided here. In response, Cigna asserted that the hospitals' data proved nothing because, it insisted, the relevant "community" necessarily includes more than just the eight plaintiff hospitals. The district court agreed and granted Cigna summary judgment.

We reverse. Even if the relevant "community" here extends beyond the eight plaintiff hospitals, their receipts alone are enough to create a genuine factual dispute about what the "community" rates are.

I

The eight plaintiff hospitals hail from seven different cities spread across two South Florida counties—five are in Palm Beach County, and three are in Miami-Dade County. They share a corporate parent, but they price their services independently.

The hospitals have treated Cigna's insureds more than 450 times even though the hospitals are outside Cigna's network. In many instances, the hospitals maintain, Cigna underpaid for the care that they provided.

The hospitals sued Cigna under a Florida statute that requires insurers to reimburse out-of-network providers for emergency care. *See id.* § 627.64194(4). In particular, the law requires insurers to pay, as relevant here, the "usual and customary provider charges for similar services in the community where the services were provided." *Id.* § 641.513(5)(b); *see also Baker Cnty. Med. Servs., Inc. v. Aetna Health Mgmt., LLC*, 31 So. 3d 842, 845 (Fla. 1st

Dist. Ct. App. 2010) ("In the context of th[is] statute, it is clear what is called for is the fair market value of the services provided.").

To support their contention that Cigna lowballed the "community" rate, the hospitals put forward an expert who pegged the relevant figure at five times what Cigna paid. In forming that estimate, he initially considered both (1) the out-of-network rates charged by the eight plaintiff hospitals and (2) in-network rates charged by the plaintiffs and roughly a dozen other South Florida hospitals. But he ultimately concluded that in-network rates didn't bear on the "community" value of out-of-network services: An in-network hospital, he reasoned, will typically discount its rates to reward insurers for steering their insureds to it. As a result, his final estimate of the "community" rate for the out-of-network services was based entirely on the eight plaintiff hospitals' data.

Cigna sought summary judgment, contending that the expert's estimate proved nothing about the statutory "community" rate because it relied exclusively on the eight plaintiff hospitals' own information. The "community," Cigna insisted, must include more than just them.

The district court agreed: "Necessarily," it held, "'the community where the services were provided' requires that fair market value be determined by considering more than just the plaintiff-providers in a particular lawsuit." Doc. 221 at 13 (quoting Fla. Stat. § 641.513(5)(b)). The court thus entered summary judgment for Cigna.

This is the hospitals' appeal.

## II

"A court should grant summary judgment only if the movant establishes that there is no genuine dispute as to any material fact." *Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014). So too, the contrapositive: "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store*, 975 F.2d 1518, 1534 (11th Cir. 1992). We review a grant of summary judgment de novo, "drawing all reasonable inferences in the light most favorable to the non-moving party." *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022).

## III

Summary judgment was inappropriate here for the simple reason that a genuine dispute exists over the core factual question in this case: What are the "usual and customary provider charges" for services like those that the eight plaintiff hospitals rendered to Cigna's insureds "in the community where the services were provided"? Fla. Stat. § 641.513(5)(b). Cigna seeks to sidestep that dispute by claiming that, as a matter of law, the plaintiff hospitals here belong to a "community" that spans all of Palm Beach and Miami-Dade Counties, and thus that any estimate of the relevant "community" rate must account for data from other Palm Beach and Miami-Dade providers. For reasons we'll explain, we're skeptical. But we needn't definitively decide that issue today, because even if Cigna is right that the "community" covers the entirety of those two counties, the plaintiff hospitals' own data are enough to create

a genuine dispute about the "usual and customary" rates in that area.

## A

As already explained, the district court held, as a matter of law, that a § 641.513(5)(b) "community" must "[n]ecessarily" include nonparty providers. Cigna offers a slightly different—though no less categorical—rule: The "community" here must include the "many other providers of emergency services" in Palm Beach and Miami-Dade Counties. Br. of Appellee at 28. That conclusion, Cigna says, follows from what it calls the "plain-English meaning" of the word "community," as well as a Florida appellate-court decision, *Baker County*, 31 So. 3d 842, that it says interpreted that term. *See* Br. of Appellee at 26–35. We're not so sure.

As for plain meaning, it's not at all clear to us that the word "community" has a single definition that requires either the district court's or Cigna's as-a-matter-of-law interpretation of it. "Community" is a broad term that can mean such things as "neighborhood, vicinity, or locality," *Community*, Black's Law Dictionary (11th ed. 2019), or "the people with common interests living in a particular area," Merriam-Webster's Collegiate Dictionary 251 (11th ed. 2014). Nothing inherent in the word's meaning requires a particular size, scope, or makeup. The district court, again, thought that a § 641.513(5)(b) "community" must "[n]ecessarily" include "more than just the plaintiff-providers in a particular lawsuit." But what of the lonely hospital in a particularly rural portion of Florida's panhandle? It may be the only one for miles, so its "community" may

well include just it. The district court's as-a-matter-of-law holding ignores—and forecloses—that possibility. Nor, we think, does "community" necessarily denote, as Cigna suggests, a county-level definition. "Community," it seems to us, could just as naturally refer to a city, a neighborhood, a zip code, or, going the other way, an entire state. For that matter, it might also refer to an area that straddles traditional jurisdictional boundaries—think, for instance, the two Kansas Cities or, closer to home, Florala, Alabama and Paxton, Florida.

Cigna also contends that the First DCA's decision in *Baker County* resolves the "community" question in its favor. *See* Br. of Appellee at 32–33. In short, we don't think so. So far as we can tell, the court there didn't even address—let alone definitively construe—the word "community."[1] True, the *trial* court in the *Baker County* case considered the term "community," but the "decision of a state trial court is not binding on the federal courts as a final expression of the state law." *Hill v. United States Fid. & Guar. Co.*, 428 F.2d 112, 114 (5th Cir. 1970). And in any event, what the trial court said there actually undermines Cigna's position before us—the court observed that "[t]he determination of what constitutes 'the community . . .' is a question of fact" that "will have to be determined through the presentation of evidence to the trier of fact."

---

[1] The court addressed only two questions: (1) whether "the term 'provider' [in § 641.513(5)(b)] . . . is limited only to hospitals" and (2) whether "the phrase 'usual and customary charges' includes consideration of the amounts billed by providers as well as the amounts accepted as payment." *Baker Cnty.*, 31 So. 3d at 845.

*Baker Cnty. Med. Servs. Inc. v. Aetna Health Mgmt., LLC*, No. 02-2006-CA-0061, 2017 WL 10647915, ¶ 10(B) (Fla. Cir. Ct. Nov. 29, 2007).

Which leads us, next, to the bottom line.

## B

Whatever the term's precise Platonic meaning, the "community" issue in this case belongs in front of a jury. Even if the word "community" means everything and exactly what Cigna claims—*i.e.*, all providers in Miami-Dade and Palm Beach Counties—a jury could, based on the plaintiff hospitals' data alone, reasonably infer that Cigna had failed to reimburse the required "usual and customary" rates in that community.

Contrary to Cigna's contention, we think that the plaintiff hospitals' rates alone could be enough to support a factfinder's reasonable determination of the "usual and customary" rates in the Palm Beach/Miami-Dade "community." Cigna insists—and we'll accept for present purposes—that there are "over a dozen other providers of ER services" in the two-county area. Br. of Appellee at 28. But we can see no reason why, as a matter of law, eight good data points—out of, say, 20, or even 30—can't support a reasonable inference about the whole set. It's all a matter of common sense, really. Consider the following analogy: Drew, a lover of live music, has made several trips to Nashville, visiting eight of the city's numerous venues. In his experience, he's *never* been asked to pay a cover charge; rather, in *every* instance, a band member has gone table to table during the show collecting tips. Would it be reasonable for Drew to infer that, in the Music City, that's the "usual and

22-10514               Opinion of the Court                    9

customary" practice? Of course it would. His data set isn't exhaustive, but it's sufficiently extensive to permit the inference.

To survive summary judgment, a plaintiff needn't present evidence that compels a single, airtight inference—just evidence that allows a reasonable one. *See Miranda*, 975 F.2d at 1534 ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."). Now, of course, it should go without saying that a reasonable inference isn't necessarily a correct one. But the way to rebut an inference allegedly skewed by limited data is to add data. And Cigna can do just that—at trial. If it can show there that most other providers in the "community" charge less than the plaintiff hospitals do, then it may well debunk the hospitals' estimate. But unless and until that happens, it remains the case that a reasonable jury *could* conclude that the eight plaintiff hospitals' rates reflect the prevailing community rate—and thus that Cigna shortchanged them. The district court was wrong to hold that this conclusion would be beyond the pale.

## IV

For these reasons, we vacate the order awarding summary judgment to Cigna and remand the case to the district court for proceedings consistent with this opinion.[2]

---

[2] We don't address Cigna's contention that the hospitals' expert's opinion can't support a reasonable estimate of the "community" rate because it excluded in-network charges, which (unsurprisingly) differ pretty radically from out-of-

**VACATED** and **REMANDED.**

---

network charges. The district court never considered that argument, so neither will we.

      Nor, given our disposition, need we reach the plaintiff hospitals' argument that the district court required them to "plead their case with [too high] a degree of specificity," in violation of Federal Rule of Civil Procedure 8. *See* Br. of Appellants at 5. The hospitals fear that Cigna will "argue on remand that [they] can establish liability only if they prove that FMV is 75%." Reply Br. of Appellants at 27. The statute says what it says: Cigna is liable if it failed to pay "the usual and customary provider charges for similar services in the community where the services were provided." Fla. Stat. § 641.513(5)(b).

22-10514               Jordan, J., Concurring                1

JORDAN, Circuit Judge, concurring:

I join Judge Newsom's opinion for the court in full. But because the case is being remanded, I offer the following thoughts on an additional reason why Cigna was not entitled to summary judgment.

The plaintiff hospitals claim that Cigna underpaid them for out-of-network emergency services they provided to its insureds. And they rely on Fla. Stat. § 627.64194(4), which incorporates the reimbursement standard set out in Fla. Stat. § 641.513(5)(b)—the "usual and customary provider charges for similar services in the community where services were provided." Under Florida law this means the "fair market value of the services provided." *Baker Cty. Med. Servs. v. Aetna Health Mgmt.*, 31 So.3d 842, 845 (Fla. 1st DCA 2010).

As noted in our opinion, Cigna argued in part at summary judgment that the relevant community had to include other providers of emergency services in Miami-Dade and Palm Beach, and could not be limited to the plaintiff hospitals themselves. We have rejected that contention at the summary judgment stage, but even if Cigna had been correct on this point summary judgment was not appropriate.

Cigna's own expert witness, Beth Edwards, provided several alternative methods for determining fair market value and figuring out whether (and to what extent) the plaintiff hospitals were underpaid. She explained in her report that one of these alternative methods (the third method) involved reviewing payments made by

Cigna for all claims submitted by Florida hospitals for emergency services from January of 2019 to March of 2021. This review encompassed 1.687 million claims associated with 337 distinct hospital providers. *See* Edwards Report at 32–33. With this information, she was able to "determine, for each disputed claim, the amount equivalent to the median reimbursement rates other market providers received for similar services in the same community." *Id.* at 34.

Ms. Edwards disagreed with the assertion of the expert for the plaintiff hospitals that reimbursement should be at 75% of billed charges, and concluded that this figure was overstated. But she opined that under the third alternative method—the one which considered payments by Cigna to hospitals throughout Florida rendering emergency services—Cigna had underpaid the plaintiff hospitals. She was "able to determine the total amount across all disputed claims that is equivalent to the median reimbursement rate other market hospitals received during the period." *Id.* at 35. From this data, she explained that on the disputed claims Cigna had paid the plaintiff hospitals $1,631,108, while the market median reimbursement for all providers in Florida was $2,385,024. The difference was $753,916. *See id.* at 35 & Figure 4. In sum, after considering payments made by Cigna to many Florida providers other than the plaintiff hospitals in the relevant markets—the very sort of analysis pressed by Cigna—Ms. Edwards opined that Cigna had underpaid by hundreds of thousands of dollars.

22-10514               Jordan, J., Concurring                              3

Cigna relied in part on Ms. Edwards' report in its statement of material facts. *See* D.E. 142 at 5–6 ¶¶ 26–27. In opposing Cigna's motion for summary judgment, the plaintiff hospitals pointed out Ms. Edwards' report and opinion about the third method of calculating fair market value. They did so in their response to Cigna's statement of material facts, and in their response to Cigna's motion for summary judgment. *See* D.E. 170 at 11 ¶ 70; D.E. 168 at 11–12.

Cigna replied that the alternative methods used by Ms. Edwards were merely used to show that the opinion of the expert for the plaintiff hospitals was overstated. *See* D.E. 172 at 3 ¶ 70. That may be one possible way of looking at things, but Ms. Edwards' report does not cast any doubt on the validity of the third alternative method. If a jury agreed with Cigna that a proper analysis of fair market value had to include providers of emergency services other than the plaintiff hospitals, it might well agree with Ms. Edwards that such an analysis would still show underpayment by Cigna. Where a defendant's expert submits a report providing an alternative analysis under which the plaintiff prevails, it is difficult to see how the defendant can be entitled to summary judgment.

On appeal, Cigna argues that the plaintiff hospitals could not rely on Ms. Edwards' report. *See* Br. for Appellee at 52. The cases it cites, however, deal only with the inability of a plaintiff to rely on the opinions of its own rebuttal expert before the defendant puts forth the opinions of its expert. *See, e.g., Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters, LLC*, 568 F. Supp. 3d 1357, 1362 (S.D. Fla. 2021) (stating that under Federal Rule of Civil Procedure

26(a)(2)(C)(ii) a party cannot rely on experts designated solely as rebuttal experts in its case-in-chief to avoid summary judgment).

I know of no legal principle that precludes the plaintiff from relying on the opinion of a defense expert, particularly where—as here—the defendant pointed to its expert's opinion in its statement of material facts. To the contrary, a number of cases "hold that, because there is no surprise or prejudice, a party is permitted to use and rely on the expert testimony presented by the opposing party." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1317 (11th Cir. 2014) (Jordan, J., concurring). See *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009) (rejecting the argument that the expert report of a settling party should not have been considered at summary judgment because the defendant cited "no authority prohibiting the use of another party's expert report for summary judgment purposes"); *De Lage Landen Operational Servs., LLC v. Third Pillar Sys., Inc.*, 851 F. Supp. 2d 850, 853 (E.D. Pa. 2012) ("[E]ither party may introduce the deposition of an opposing party's expert if the expert is identified as someone who may testify at trial because those opinions do not belong to one party or another but rather are available for all parties to use at trial.") (internal quotation marks omitted); *Penn Nat'l Ins. Co. v. HNI Corp.*, 245 F.R.D. 190, 193 (M.D. Pa. 2007) ("The practical effect of a[n] [expert] designation is . . . to bring an expert and his report within the universe of material that is discoverable by all parties and, generally, admissible at trial."); *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 245 (N.D. Iowa 1996) ("[O]nce an expert is designated, the expert is recognized as presenting part of

22-10514               Jordan, J., Concurring                5

the common body of discoverable, and generally admissible, information and testimony available to all parties."); *Jobin v. Resol. Tr. Corp.*, 160 B.R. 161, 171–72 (D. Colo. 1993) ("A nonmoving party may rely on the affidavit of an expert in opposition to a motion for summary judgment if the expert would be qualified to give his or her opinion at trial.").